

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 13, 2016 Session

## ALEXANDER STRATIENKO v. LISA STRATIENKO

**Appeal from the Circuit Court for Hamilton County**
**No. 13D2251     L. Marie Williams, Judge**

_____

### No. E2016-00542-COA-R3-CV

_____

In this domestic relations action, the parties divorced following a twenty-six-year marriage. The trial court valued the parties' marital assets, including the husband's medical practice, and fashioned an equal distribution. In addition, the court awarded the wife alimony *in futuro* in the amount of $5,000 per month as well as alimony *in solido* in the amount of $4,500 per month for ten years. The court further ordered the husband to maintain his $1,000,000 life insurance policy in effect to secure the wife's spousal support awards. The husband has appealed. We modify the trial court's judgment to provide for a lien on a portion of the husband's assets sufficient to secure his alimony *in solido* obligation in the amount of $540,000, and accordingly reduce his court-ordered obligation with regard to maintenance of a life insurance policy in the amount of $1,000,000 to the amount of $500,000. We affirm the trial court's judgment in all other respects. We deny the wife's request for an award of attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

William H. Horton, Chattanooga, Tennessee, for the appellant, Alexander Stratienko.

Glenna M. Ramer, Chattanooga, Tennessee, for the appellee, Lisa Stratienko.

## OPINION

### I. Factual and Procedural Background

Dr. Alex Stratienko ("Husband") filed a complaint for divorce against Lisa Stratienko ("Wife") following twenty-four years of marriage. Two daughters were born of the marriage, both of whom had attained the age of majority prior to trial. At the time of trial, Husband was a cardiologist in Chattanooga who had started his own practice, Cardiac and Vascular Associates, P.C. ("CVA"), in 1999. The parties also began a business during the marriage known as McNeal Properties, LLC ("McNeal"), which constructed and manages the office building housing CVA and other professional practices.

Before the parties' marriage in 1989, Husband had completed college and medical school and was in his third year of a cardiology fellowship at a hospital in Virginia. Wife had earned her Bachelor's degree and was in the process of obtaining a Master's degree while working as a ward secretary at the same hospital. Wife was employed outside the home during the initial years of the marriage until the birth of the parties' eldest daughter in 1992. By that time, the parties had moved to Pennsylvania to reside near Husband's aging parents, for whom Wife helped provide care. Wife explained that Husband's father was diagnosed with Alzheimer's Disease and could no longer drive and that Husband's mother had never driven. Therefore, Wife transported the couple to doctor's appointments and provided other care.

In 1993, the parties, along with Husband's parents, relocated to Chattanooga, where Husband began employment with the Chattanooga Heart Institute. The parties' younger daughter was born in 1996. Wife served as a stay-at-home mother for the children for several years while Husband worked in the medical practice. Husband left his employment with Chattanooga Heart Institute in 1998 and was later sued by the practice regarding a non-compete agreement.

In 1999, the parties began CVA. Husband acknowledged at trial that Wife assisted him with CVA's business operations during the early years while he worked an arduous schedule. Wife described this period as "busy" in that Husband's father was extremely ill, Husband was working more and thus less involved at home, and Wife was providing care for the children and Husband's parents while helping Husband with the practice. Wife testified that she performed duties such as supervising staff, making deposits, filing charts, designing and decorating the office, interacting with CVA's accountant, managing the health insurance and retirement plans, and marketing the practice. Husband worked sixty to eighty hours per week at CVA. He also taught continuing education classes for other physicians, for which Wife designed and printed

2

materials and advertising, managed hotel and catering arrangements, and maintained an accounting. Wife was not compensated for her work.

According to Wife, when Husband began his employment through CVA, his income increased tremendously. In 2000 or 2001, the parties built an approximately 5,000-square-foot home on Lookout Mountain. Both were involved in the design and construction of the home. When Wife's father passed away in 2002, Wife inherited one-third of his 1.3-million-dollar estate. From this inheritance, Wife deposited cash into the parties' joint account and also made deposits into the children's educational funds.

During this approximate timeframe, the parties, with the assistance of a friend named Oscar Brock, located a lot near all three Chattanooga hospitals, upon which they endeavored to construct a commercial building to accommodate CVA and other medical tenants. Husband, Wife, and Mr. Brock formed McNeal and, through the company, purchased the parcel and built a commercial building thereon. Wife testified that she and Mr. Brock met with architects and designed the facility. Wife further related that she worked closely with the builder and selected décor and fixtures. After CVA moved to this new location, Wife continued to perform work for CVA without compensation. According to Wife, she assumed some duties of a practice manager, often working forty or more hours per week. She also performed various responsibilities for McNeal, including designing and marketing the office space, creating a brochure, and procuring tenants. Wife likewise received no compensation for her work for McNeal.

In 2003, Husband became enmeshed in litigation with Erlanger Hospital regarding his hospital privileges. Wife testified that she "stood in" for Husband during depositions and performed work relevant to the case so that Husband could continue to concentrate on his medical practice. According to Husband, Wife "spearheaded" his defense, spending tremendous amounts of time on the litigation. Husband also related that the proceedings cost them hundreds of thousands of dollars through the years, which proved difficult on their marriage, the children, and their quality of life. Wife opined that litigation expenses actually totaled approximately three million dollars.

The parties appear to agree that their marriage began to deteriorate during this time, although their opinions differ regarding the reasons. Their discord reached a zenith around Christmas 2011, when Wife claimed Husband became verbally abusive toward their eldest daughter and physically abusive toward Wife. The parties separated shortly thereafter, with Wife and the children remaining in the marital residence and Husband moving to a rental property. Husband admitted that following his departure, he removed $375,000 from the parties' joint checking account, leaving a balance of $5,000 for Wife's use. Husband did not dispute Wife's testimony that he informed Wife he would thereafter provide her an "allowance" in the amount of $5,000 per month. Husband

asserted that this amount was commensurate with their pre-separation expenses so long as he continued to pay the taxes and insurance on the marital residence. Wife explained that Husband subsequently provided her with $5,000 per month for the first eight months of 2012 and then stopped sending her money altogether until the trial court ordered him to pay temporary alimony beginning in February 2014. According to Wife, because she had no other source of income, she was forced to liquidate her separate, inherited assets and to charge expenses on her credit cards in order to defray her living expenses and legal fees during that time.

In 2012, Mr. Brock instituted an action against Husband and Wife upon being "excluded" from McNeal by the parties due to his failure to meet a capital call. Husband filed the instant divorce action in November 2013. By the time of trial, the parties remained involved in litigation with Mr. Brock to determine their respective ownership interests in McNeal.

On December 26, 2013, Wife filed a motion in the case at bar seeking an award of alimony and child support *pendente lite*. The trial court entered a temporary order on January 17, 2014, directing the parties to participate in mediation and ordering Husband to pay temporary spousal support in the amount of $20,000 per month. The court conducted a hearing regarding temporary alimony in April 2014, subsequently ruling that Husband would pay Wife $18,000 per month pending trial. Wife was ordered to pay the taxes and insurance related to the marital residence.

Early in this litigation, the parties reached an agreement regarding certain issues, including that (1) Husband could expend monies to purchase a condominium for his own use, (2) Husband would continue to provide health and dental insurance coverage for Wife and the remaining minor child pending trial, (3) Husband would provide Wife with $45,000 to pay toward her attorney's fees, (4) Husband would continue paying temporary alimony of $18,000 per month, and (5) Wife would have unfettered access to the McNeal business records. An acrimonious environment intensified through the remainder of the proceedings, however, as each party filed numerous motions for relief, including several motions alleging contemptuous conduct by the opposing party and motions seeking sanctions. The trial court conducted a bench trial on June 2 and 3, 2014. At the conclusion of trial, Wife's counsel was afforded additional time to file the deposition of an asset valuation expert. On April 13, 2015, the court awarded Wife an additional $48,000 toward her legal expenses. In its order, the court noted that the parties had agreed to initiate the process of placing the marital residence on the market for sale.

The trial court issued a memorandum opinion on December 8, 2015. Noting that the parties had been married for twenty-six years, the court declared the parties divorced pursuant to Tennessee Code Annotated § 36-4-129. The court determined that both

parties had credibility issues "because of the drive of each to accomplish a specific result." In support, the court stated: "While this is typical of many parties in a contested divorce, the intellectual capacity of these parties exacerbates the phenomenon."

With regard to the statutory factors relative to an equitable distribution of property, the trial court found that both parties made equal contributions to the marriage, financial and otherwise. Although Husband asserted that Wife wasted money and overspent following the parties' separation, the court found that Wife's spending was consistent with the lifestyle established during the marriage. The court also noted that despite Husband's contention that Wife "wasted" money on litigation, "[t]he Court finds it disingenuous of [Husband] to criticize [Wife's] involvement in litigation and the expense incident thereto when his litigation history is comparable." The court also determined that Wife had contributed a portion of her inherited assets to the parties' joint estate. The court concluded that Wife had not dissipated marital assets.

As demonstrated by the proof, both parties were in good physical and mental health and were of comparable ages, with Husband sixty-two years of age and Wife fifty-eight years of age at the time of trial. The trial court determined that Husband possessed "vastly" greater vocational skills, employability, and earning capacity than Wife. The court also noted that although neither party contributed to the education of the other, Wife had relocated several times to support Husband's career and care for his parents.

Concerning an equitable distribution, the trial court attempted to fashion a division of marital property that was largely equal. Specifically, the court ordered that the marital residence be sold and the proceeds divided equally. Wife was awarded the parties' partial ownership interest in a condominium in South Carolina, which the court valued at $450,000. Husband was awarded a condominium purchased by the parties for Husband's mother. Various financial accounts and stocks were divided equally. Husband was awarded CVA at a value of $245,000. Due to the pending litigation regarding ownership of McNeal, the court declined to determine a value concerning that asset. Instead, Husband was ordered to transfer to Wife a sufficient interest in McNeal such that her ownership therein would equal that of Husband and CVA. The court ultimately awarded Wife a payment of $259,406 in cash in order to equalize the marital property distribution.

With reference to Wife's claim for spousal support, the trial court determined that alimony was appropriate because Husband had demonstrated an ability to pay and Wife had proven (with Husband conceding) that she manifested a reasonable level of need. The court found that the post-divorce standard of living expected to be available to Husband would be substantially greater than that expected to be available to Wife in the absence of alimony. Because neither rehabilitative nor transitional alimony would accomplish the objective of providing Wife a comparable standard of living to that

enjoyed during the marriage, the court determined that long-term alimony was appropriate.

As to the appropriate amount of an alimony award, the trial court calculated Wife's reasonable needs post-divorce to be $15,500 per month. The court deducted Wife's anticipated income from investments of approximately $5,760 per month, establishing a remaining need of approximately $9,740 per month. As a result, the court awarded Wife alimony *in futuro* in the amount of $5,000 per month plus alimony *in solido* of $4,500 per month for ten years. With regard to the alimony *in solido* award, the court determined that Husband's greater income and ability to accumulate assets would enable him to retire early, with the court further opining that "his animosity towards [Wife] makes that possibility more probable." The court also ordered Husband to maintain his $1,000,000 life insurance policy to secure Wife's alimony awards.

Because Husband had deducted sums from his alimony *pendente lite* payments despite previously being directed not to do so, the court specifically found such conduct to be contemptuous. The court also determined that Wife's needs preceding the award of assets from the court's equitable distribution exceeded her needs post-divorce, such that the court declined Husband's request to retroactively modify the temporary alimony. The court also declined to award attorney's fees to either party, concluding that each had the ability to pay his or her own fees. The court entered a final order on December 18, 2015, incorporating its written memorandum opinion.

Both parties filed motions seeking relief pursuant to Tennessee Rule of Civil Procedure 59, in addition to numerous other motions regarding enforcement of the trial court's adjudication. The trial court denied the Rule 59 motions, except to modify the equalizing payment owed by Husband by deducting a previously ordered $50,000 payment of attorney's fees to Wife. Husband timely filed the instant appeal.

## II. Issues Presented

Husband presents the following issues for our review, which we have restated slightly:

1.    Whether the trial court erred in its determination that Husband should pay Wife temporary alimony in an amount that exceeded the parties' pre-separation standard of living and included expenses for the children.

2.    Whether the trial court erred in its determination of the nature and amount of alimony *in futuro* and *in solido* awarded to Wife.

3. Whether the trial court erred by requiring Husband to maintain his $1,000,000 life insurance policy to secure his alimony obligations to Wife.

4. Whether the trial court erred in its valuation and allocation of marital assets and debts.

5. Whether the trial court erred by awarding to Wife an equal interest in the governing rights of McNeal when the parties demonstrated a history of discord regarding business operations.

6. Whether the trial court erred by allowing Wife to remain as sole custodian of the children's educational funds.

Wife presents the following additional issues for review, which we have also restated slightly:

7. Whether the trial court erred by declining to award to Wife her attendant attorney's fees and declining to assess fines against Husband after finding him in contempt.

8. Whether the trial court erred by declining to award additional attorney's fees to Wife because Husband's litigation strategy was abusive.

9. Whether Wife should receive an award of attorney's fees on appeal.

### III. Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings

unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted) (emphasis in original). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Regarding alimony, our Supreme Court has "repeatedly and recently observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *See Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The Court has further explained:

[A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard* [*v. Kinard*], 986 S.W.2d [220,] 234 [(Tenn. Ct. App. 1998)]. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson* [*v. SAIA, Inc.*], 318 S.W.3d [328,] 335 [(Tenn. 2010)] (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Id*. at 105-06 (other internal citations omitted).

## IV. Temporary Alimony Award

Husband asserts that the trial court abused its discretion by awarding Wife temporary alimony of $20,000 per month in January 2014 and only slightly reducing that award to $18,000 per month in April 2014. According to Husband, Wife's claimed expenses were inflated and unreasonable because (1) she included expenses for the children when he was also paying $2,100 per month in child support and $20,000 per year in tuition for Girls Preparatory School and (2) family living expenses before separation averaged only $6,500 per month.

Wife presented an income and expense statement attached to her December 26, 2013 motion seeking spousal and child support *pendente lite*. Wife detailed approximately $21,000 per month in expenses, some of which were listed as expenses for the children. During the respective motion hearing, the trial court ordered the parties to

participate in mediation while also directing Husband to pay to Wife $20,000 per month in alimony and $2,100 per month in child support *pendente lite*. Following a subsequent hearing during which the trial court heard testimony regarding alimony, the court reduced the temporary alimony award to $18,000 per month in April 2014. Because the record contains no transcript or statement of the evidence from that hearing, we must presume that the evidence presented was sufficient to support the trial court's decision. As this Court has previously explained in a case involving review of an alimony award:

> Our review of the action of the trial court in awarding alimony in this case is severely hampered by the absence of a transcript of the proceedings or statement of evidence introduced at the March 11, 2005 hearing. The Tennessee Rules of Appellate Procedure place the responsibility for preparing an accurate transcript or statement of the evidence upon the appellant. Without a statement of the evidence which accurately reflects the evidence presented to the trial court, we must presume that the record, had it been accurately presented to this Court, would contain sufficient evidence to support the trial court's decision.

*Heikkenen v. Heikkenen*, No. M2005-01084-COA-R3-CV, 2007 WL 1411842, at *4 (Tenn. Ct. App. May 11, 2007) (internal citations omitted).

At trial, Husband acknowledged that his gross income averaged approximately $600,000 per year, which equates to $50,000 per month. Prior to her receipt of assets through the divorce, Wife had no source of income. Accordingly, Wife demonstrated a need for spousal support while Husband had the ability to pay an award of temporary alimony. *See Gonsewski*, 350 S.W.3d at 110 ("[T]he two [factors] that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.") (quoting *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. 1995)).

Husband complains in his appellate brief, as he did during his trial testimony, of Wife's "excessive spending" following their separation. By way of example, Husband references Wife's alleged expenditures of over $800,000 on credit cards during a three-year period. As Wife explained, however, and Husband acknowledged, he removed almost all of the parties' funds from their joint checking account upon separation, leaving Wife with only $5,000 in that account. It is undisputed that Husband subsequently provided Wife an "allowance" of $5,000 per month for eight months before ending payments altogether. Wife indicated that she was forced to make expenditures for basic needs by using her credit cards. In addition, Wife explained and Husband did not dispute that she paid for a portion of her legal fees and treatment for their daughter's eating disorder with her credit cards. Moreover, the credit accounts were utilized to make purchases for office furnishings and decorations later reimbursed to her by McNeal.

10

Upon proof at trial concerning this issue, the court concluded that Wife's post-separation spending was not excessive and that Wife demonstrated a need for the alimony awarded. As the trial court noted, Husband maintained exclusive control of most of the parties' assets during the entire period of their separation and divorce proceedings, which spanned a period of over three years.

According to Husband, the trial court's determination of Wife's need in the reduced amount of $9,740 following the divorce demonstrates that the temporary alimony award was excessive. Husband's argument, however, fails to take into account that (1) the marital residence was in the process of being sold such that Wife's housing-related expenses would subsequently be reduced, and (2) Wife was awarded significant assets in the divorce from which she could thereafter receive income. By contrast, Wife had no source of income prior to the award of these assets.

As the trial court elucidated in its Memorandum Opinion in pertinent part:

> The Court's decision concerning alimony is based in large part upon the division of assets and liabilities and the income to be realized by [Wife] from the assets awarded to her in that division. Those assets do not become her property until after this cause is finalized. <u>Thus, her need has been greater before this Opinion. Accordingly, the Court finds it is not appropriate to modify the alimony retroactively</u>. Therefore, no credit is awarded to [Husband] for any payments of alimony to date.

(Emphasis added.) Having carefully reviewed the record in this case, we conclude that Husband's arguments regarding the award of temporary alimony are unpersuasive. We discern no error in the amount of the trial court's temporary alimony award.

## V. Current Spousal Support

In its final order, the trial court awarded to Wife alimony *in solido* in the amount of $4,500 per month for ten years plus alimony *in futuro* in the amount of $5,000 per month. The court determined that Wife's reasonable needs post-divorce would be $15,500 per month based upon the evidence presented at trial. The court deducted from those needs Wife's expected income from investments of approximately $5,760 per month, resulting in an ongoing need of approximately $9,740 per month.

### A. Types of Alimony Awards

Husband concedes on appeal that some award of alimony to Wife is appropriate due to her "relative economic disadvantage." He takes issue, however, with the trial

court's decision to award Wife alimony *in futuro* and *in solido* as opposed to an award of rehabilitative or transitional alimony.

Our statutory scheme regarding awards of alimony, provided in Tennessee Code Annotated § 36-5-121 (2014), states in pertinent part:

> (c)(1) Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often results in economic detriment to the spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

> (2) The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

> (d)(1) The court may award rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in solido, also known as lump sum alimony or a combination of these, as provided in this subsection (d).

> (2) It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony. . . .

> (3) Where there is relative economic disadvantage and rehabilitation is not feasible, in consideration of all relevant factors, including those set out in subsection (i), the court may grant an order for payment of support and

maintenance on a long-term basis or until death or remarriage of the recipient, except as otherwise provided in subdivision (f)(2)(B).

(4) An award of alimony in futuro may be made, either in addition to an award of rehabilitative alimony, where a spouse may be only partially rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

(5) Alimony in solido may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate.

(e)(1) Rehabilitative alimony is a separate class of spousal support, as distinguished from alimony in solido, alimony in futuro, and transitional alimony. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

* * *

(f)(1) Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible . . . .

* * *

(g)(1) Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or

13

other proceeding where spousal support may be awarded, such as a petition for an order of protection.

* * *

(h)(1) Alimony in solido, also known as lump sum alimony, is a form of long term support, the total amount of which is calculable on the date the decree is entered, but which is not designated as transitional alimony. Alimony in solido may be paid in installments; provided, that the payments are ordered over a definite period of time and the sum of the alimony to be paid is ascertainable when awarded. The purpose of this form of alimony is to provide financial support to a spouse. In addition, alimony in solido may include attorney fees, where appropriate.

* * *

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

> (3) The duration of the marriage;

> (4) The age and mental condition of each party;

> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

In the instant case, the trial court made extensive findings regarding the statutory factors throughout its Memorandum Opinion. With reference to the first factor, the court found that Husband had "vastly greater vocational skills, employability, and earning capacity" than Wife. Although both parties were awarded significant assets in the divorce, the trial court found that Husband would have a greater ability to accumulate assets in the future due to his income. The court likewise found that with Husband's earning capacity, his liabilities were easily managed.

Concerning the second and third factors, the trial court noted that Wife had completed a Bachelor's degree and at least completed coursework toward a Master's degree. Husband was a medical doctor with "extensive" credentials in cardiology. Husband operated a thriving medical practice, which Wife had assisted in building. Except for her responsibilities associated with CVA and McNeal, Wife had not worked outside the home since the birth of the parties' eldest daughter in 1992. As previously noted, the parties had been married for twenty-six years at the time of trial.

Regarding the fourth and fifth factors, the trial court found that both parties enjoyed good physical and mental health and were of comparable age. Wife testified that she had been diagnosed with Sjögren's Syndrome, an autoimmune disorder that she claimed was quite debilitating. The court noted, however, that Wife presented no medical proof on this issue. Concerning factor number six, as the parties' daughters were adults, neither party would be prohibited from seeking employment outside the home.

Factor number seven is essentially inapplicable inasmuch as neither party possessed significant separate assets. With regard to the eighth factor, the trial court divided the marital assets equally, with each party receiving $3,400,000 in various assets from the marriage. As factor number nine concerns standard of living, the trial court determined that the parties enjoyed a luxurious standard of living during marriage, especially during later years. This included an expensive home on Lookout Mountain, nice vehicles, vacations, and the children's attending affluent, private schools. With regard to the tenth factor, the court concluded that both had substantially contributed to the marital estate. Although the court found that Wife had not contributed to Husband's education, the court determined that Wife had contributed to Husband's increased earning capability and had suffered economic detriment for the benefit of the marriage. The court also determined that Husband had amassed greater Social Security benefits than Wife. No consideration was given to marital fault.

Our thorough review of the record leads us to conclude that the trial court's findings regarding the applicable alimony factors are supported by the evidence presented. Based on the proof, the trial court also determined that neither rehabilitative nor transitional alimony would suffice to bridge the economic gap between the parties. *See* Tenn. Code Ann. § 36-5-121(c)(2) ("[T]he economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties."). We agree with the trial court's conclusion. *See, e.g., Jenkins v. Jenkins*, No. E2014-02234-COA-R3-CV, 2015 WL 5656451, at *5 (Tenn. Ct. App. Sept. 25, 2015) (determining that rehabilitative alimony was inappropriate because "even with additional education or training, Husband presented no evidence that Wife's income level could ever be comparable to his."). Furthermore, Husband presented no evidence that Wife had the capacity for self-sufficiency with only a need for short-term financial assistance via transitional alimony "to adjust to the economic consequences of a divorce." *See* Tenn. Code Ann. § 36-5-121(g)(1). Rather, Wife had no income and no reasonable employment opportunities. Ergo, as the trial court concluded, long-term support is necessary in this case. *See Gonsewski*, 350 S.W.3d at 109.

Based upon its findings, the trial court, *inter alia*, awarded Wife alimony *in futuro* in the amount of $5,000 per month. With regard to this type of spousal support, our Supreme Court has elucidated:

> The first type of spousal support, alimony in futuro, is intended to provide support on a long-term basis until the death or remarriage of the recipient. Tenn. Code Ann. § 36-5-121(f)(1). This type of alimony can be awarded where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." *Id. See also Burlew* [*v. Burlew*], 40 S.W.3d [465,] 470-71 [(Tenn. 2001)]; *Riggs v. Riggs,* 250 S.W.3d 453, 456 n.2 (Tenn. Ct. App. 2007). Alimony in futuro is appropriate when
>
> > the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.
>
> Tenn. Code Ann. § 36-5-121(f)(1).
>
> Alimony in futuro "is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse." *Riggs,* 250 S.W.3d at 456 n.2. In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage. *Robertson* [*v. Robertson*], 76 S.W.3d [337,] 340 [(Tenn. 2002)]. While enabling the spouse with less income "to maintain the pre-divorce lifestyle is a laudable goal," the reality is that "[t]wo persons living separately incur more expenses than two persons living together." *Kinard* [*v. Kinard*], 986 S.W.2d [220,] 234 [(Tenn. Ct. App. 1998)]. "Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle . . . ." *Id.* It is not surprising, therefore, that "[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony." *Robertson,* 76 S.W.3d at 340.

*Gonsewski*, 350 S.W.3d at 107-08.

17

In this case, the evidence demonstrated that a significant income disparity existed between the parties. Although Wife is educated and skilled, her work experience during the past twenty-five years has been limited to the parties' businesses. Furthermore, Wife's current income is derived solely from the assets she was awarded in the divorce. Husband, by contrast, earns an average income of $600,000 or more per year. Husband has a significantly higher earning capacity than Wife and enjoys a much greater ability to accumulate assets. Without an award of long-term support, Wife would have no anticipation of maintaining a standard of living even approaching that of Husband's. We conclude that the trial court's award of alimony *in futuro* was appropriate and was not an abuse of discretion.

In addition to the award of alimony *in futuro*, the trial court awarded to Wife alimony *in solido* in the amount of $4,500 per month for ten years. In support, the trial court clearly explained that the *in solido* award was predicated on the finding that Husband's "income and ability to accumulate assets make it easily possible for him to retire at an early age and his animosity towards [Wife] makes that possibility more probable." Husband argues that an award of alimony *in solido* is typically utilized to equalize a marital property distribution and is therefore inappropriate in this case, where the property distribution was already equal. However, as our Supreme Court has explained with regard to alimony *in solido*:

> The second type of support, alimony in solido, <u>is also a form of long-term support</u>. The total amount of alimony in solido is set on the date of the divorce decree and is either paid in a lump sum payment of cash or property, or paid in installments for a definite term. Tenn. Code Ann. § 36-5-121(h)(1); *Broadbent* [*v. Broadbent*], 211 S.W.3d [216,] 222 [(Tenn. 2006)] ("Alimony *in solido* consists of a definite sum of money that is paid in a lump sum or in installments over a definite period of time."). "A typical purpose of such an award would be to adjust the distribution of the parties' marital property." *Burlew* [*v. Burlew*], 40 S.W.3d [465,] 471 [(Tenn. 2001)]. Alimony in solido "<u>may be awarded in lieu of or in addition to any other alimony award, in order to provide support</u>, including attorney fees, where appropriate." Tenn. Code Ann. § 36-5-121(d)(5). Unlike alimony in futuro, the other form of long-term support, alimony in solido is considered a final judgment, "not modifiable, except by agreement of the parties," and does not terminate upon the death or remarriage of the recipient or payor spouse. Tenn. Code Ann. § 36-5-121(h)(2)-(3); *see Riggs* [*v. Riggs*], 250 S.W.3d [453,] 456 n.3 [(Tenn. Ct. App. 2007)].

*Gonsewski*, 350 S.W.3d at 108 (emphasis added). The statute specifically provides that "Alimony in solido may be awarded in lieu of or in addition to any other alimony award,

in order to provide support . . . ." Tenn. Code Ann. § 36-5-121(d)(5). Furthermore, the statute explains that "[t]he purpose of this form of alimony is to provide financial support to a spouse." Tenn. Code Ann. § 36-5-121(h)(1). Because the statute makes no mention of utilizing alimony *in solido* solely to equalize a property distribution, alimony *in solido* is recognized as a form of long-term support that may be used to adjust a marital property distribution or to provide financial support to a spouse.

In a decision rendered by our Supreme Court specifically involving an award of alimony *in solido*, the High Court affirmed an *in solido* award of $220,000 to the wife even though she was awarded 60.7% of the marital estate, or $377,400, through the trial court's equitable division. *See Burlew v. Burlew*, 40 S.W.3d 465, 472 (Tenn. 2001). The Supreme Court explained that although the "trial court did not fully explain the basis of its award," the Court found no basis to reverse the award. *Id*. at 473. The Court elucidated that so long as the trial court "considers the purposes of alimony, discussed above, and the specific factors listed in the statute, Tenn. Code Ann. § 36-5-101(d), it has wide discretion in determining the appropriate award." *Id*. at 472. *See also Langley v. Langley*, No. M2002-02278-COA-R3-CV, 2003 WL 22989026, at *3 (Tenn. Ct. App. Dec. 19, 2003) (holding that an award of alimony *in solido* in the amount of $360,000 would be affirmed despite the trial court's award of 57% of the marital estate, or 1.3 million dollars, to the wife); *Coke v. Coke*, No. 02A01-9210-CV-00279, 1993 WL 477016, at *4 (Tenn. Ct. App. Nov. 15, 1993) (holding that an award of alimony *in solido* was appropriate, despite the near-equal division of marital property, because an award of periodic alimony would result in the wife "constantly hav[ing] to battle Husband for those payments.").

In this case, the trial court rendered an equal distribution of marital property before addressing whether an award of spousal support to Wife was warranted. Following the trial court's exhaustive consideration in its memorandum opinion of the purposes of alimony awards as well as the applicable statutory factors, the trial court awarded alimony *in futuro* in the amount of $5,000 per month plus alimony *in solido* in the amount of $4,500 per month for ten years. The alimony *in solido* award was not made to equalize the marital property distribution because such purpose had already been accomplished. Rather, the trial court reasoned that such award was necessary to prevent Husband from voluntarily reducing his income in order to thwart Wife's ability to collect spousal support.

The record supports the trial court's conclusion. During the course of this litigation, Husband not only significantly removed Wife's access to marital funds, he repeatedly deducted amounts from her temporary alimony payments, which behavior the court deemed contemptuous. Following our thorough review of the record and consideration of the applicable statutory factors, we determine that the trial court did not

abuse its discretion in rendering an award of alimony *in solido* in this case. *See, e.g., Coke*, 1993 WL 477016, at *3 (affirming an award of alimony in solido when the court determined that the divorce had not been "amicable," that the husband was "uncooperative and [held] little respect for the judicial system," and that the course of the litigation demonstrated that the husband did not intend to pay alimony).

Husband asserts that if Wife procures employment or if he retires in the next few years, his alimony obligation will likely decrease. These arguments are more appropriately suited to a modification petition with regard to the alimony *in futuro* award if and when these events occur. Having determined that the trial court did not abuse its discretion regarding the types of alimony awarded, we must also address whether the amount of alimony awarded was appropriate.

## B. Amount of Alimony Awards

Husband argues, *inter alia*, that the trial court erred in determining that Wife's reasonable needs post-divorce would be $15,500 per month. At trial, Wife presented an expense statement demonstrating monthly expenses of $18,151 solely for her, which included expenses related to maintenance of the marital residence. Wife explained that following the divorce, however, her listed expenses associated with housing would be reduced following the sale of the marital residence. Wife also explained that she would incur increased expenses following the divorce related to her medical insurance and prescription medication because she could no longer utilize Husband's health insurance. Wife further related that she would incur additional automobile expenses in the future because her vehicle needed to be replaced. Considering Wife's testimony and the documents presented, the trial court determined that Wife's reasonable post-divorce expenses would be approximately $15,500 per month, thus reducing the amount sought by Wife by $2,651 per month.

Following our thorough review of the record, we conclude that the trial court did not err in its determination of the amount of Wife's reasonable monthly expenses. Although Wife was cross-examined at length regarding this issue, Husband's counsel was unable to establish that Wife's expenses were more than slightly inflated. The trial court reduced Wife's claimed expenses by nearly $3,000 per month, accounting for her reduced housing and utility costs following the sale of the marital residence, as well as any other marginally inflated expenses. Wife's testimony regarding her new health insurance and prescription costs was unrefuted. Further, Wife will continue to incur additional expenses following the divorce in keeping with the parties' established standard of living, which the trial court found "more than comfortable." As the court determined, during the marriage the parties enjoyed a luxurious home, employed the regular services of a housekeeper, traveled, sent their children to private schools, and drove expensive and

reliable vehicles. The evidence does not preponderate against the court's determination regarding Wife's reasonable post-divorce expenses.

From Wife's expenses, the trial court deducted $5,760 per month to account for the income that Wife would earn from the assets awarded to her through the divorce. At trial, Husband's accounting expert testified that if Wife invested the 1.5 million dollars proposed to be awarded to her from investment accounts, she would generate a yearly income of $60,000. Wife's accounting expert testified that if Wife invested 1.7 million dollars in assets, she could generate a yearly income of $69,126. The trial court adopted the income figure calculated by Wife's expert, which is to Husband's benefit.[1] The trial court thus concluded that Wife's alimony need following entry of the divorce judgment would be approximately $9,740 per month. Given Husband's average monthly income in excess of $50,000, we conclude that he maintains the ability to pay an award of spousal support. We further conclude that the trial court appropriately granted to Wife total alimony awards in the amount of $9,500 per month. We therefore affirm the trial court's spousal support awards in both type and amount.

## VI. Life Insurance Requirement

Husband asserts that the trial court erred in requiring him to maintain a life insurance policy valued at $1,000,000 to secure his spousal support obligations to Wife. As provided in Tennessee Code Annotated § 36-5-121(l):

> To secure the obligation of one party to pay alimony to or for the benefit of the other party, the court may direct a party to designate the other party as the beneficiary of, and to pay the premiums required to maintain, any existing policies insuring the life of a party, or to purchase and pay the premiums required to maintain such new or additional life insurance designating the other party the beneficiary of the insurance, or a combination of these, as the court deems appropriate.

Husband acknowledges that the trial court has discretion regarding whether to order maintenance of a life insurance policy as security for his alimony obligation. *See Edwards v. Edwards*, No. M2010-02223-COA-R3-CV, 2012 WL 2337535, at *12 (Tenn. Ct. App. June 19, 2012) ("By using the word 'may' rather than the word 'shall,' the legislature has indicated that the courts are to use their discretion in this regard."). Husband argues, however, that such discretion was abused in this matter because his alimony *in solido* obligation only totals $540,000, rendering the required policy amount

---

[1] Although the trial court did not explicitly adopt the income figure generated by Wife's expert, the court's determination can be inferred from the fact that $69,126 divided by twelve months would yield a monthly income amount of $5,760.

of $1,000,000 excessive. Husband's argument ignores the alimony *in futuro* award, which would result in Husband's total alimony obligation surpassing $1,000,000 within ten years.[2] Husband also argues that the expense of maintaining the life insurance policy in the amount directed by the court would be cost prohibitive.

> We note that an award of alimony *in solido* is

> fundamentally the award of a definite sum of money; and if the sum is payable in installments, the payments run for a definite length of time. The sum is payable in full, regardless of future events such as the death of the husband or the remarriage of the wife. Gross alimony becomes a vested right from the date of the rendition of the judgment, and the manner of its payment in no wise affects its nature or effect.

*McKee v. McKee*, 655 S.W.2d 164, 165 (Tenn. Ct. App. 1983). Under appropriate circumstances, courts have placed a lien on the obligor spouse's property to secure the payment of alimony *in solido* in lieu of requiring the maintenance of a life insurance policy. *See, e.g.,* Tenn. Code Ann. § 36-4-121(e)(2) ("The court may impose a lien upon the marital real property assigned to a party as security for the payment of spouse support . . . ."); *Ligon v. Ligon*, 556 S.W.2d 763, 768 (Tenn. Ct. App. 1977); *Coke*, 1993 WL 477016, at \*4; *Tooley v. Tooley*, No. 01-A-01-9009-CV-00315, 1991 WL 11535, at \*1 (Tenn. Ct. App. Feb. 6, 1991). Because the award of alimony *in solido* is for a definite sum, we conclude that placing a lien on Husband's assets in the amount of $540,000 would reduce the amount of life insurance necessary to secure Husband's alimony obligations but would also provide Wife with a means of enforcing the alimony *in solido* award. We therefore modify the trial court's judgment to impose a lien upon a portion of Husband's assets in the amount of $540,000 in order to secure the alimony *in solido* award to Wife. We remand this matter to the trial court for a determination regarding which asset(s) would be appropriate to encumber. We also modify the trial court's judgment by reducing the amount of Husband's court-ordered life insurance obligation from $1,000,000 to $500,000, which amount we determine to be sufficient to secure Husband's alimony *in futuro* obligation.

---

[2] As this Court has previously recognized, Tennessee Code Annotated § 36-5-121(l) "authorizes the trial court to require an obligor spouse to maintain life insurance coverage on his own life, designating the other spouse as beneficiary, in order to secure his alimony obligation." *See Jackman v. Jackman*, 373 S.W.3d 535, 547 (Tenn. Ct. App. 2011) (affirming the trial court's requirement that the obligor spouse maintain a life insurance policy to secure his alimony *in futuro* obligation). The statute makes no distinction based upon the type of alimony awarded. *See* Tenn. Code Ann. § 36-5-121(l).

## VII. Marital Property Valuation and Distribution

Husband contends that the trial court erred in awarding Wife an "equalization payment" in order to render the marital property distribution equal. Husband argues that this payment would not have been necessary if (1) the trial court had not made a valuation error regarding CVA and (2) the court had not failed to consider Husband's alleged overpayment of temporary alimony and Wife's dissipation of funds. We will address each of these points in turn.

With reference to CVA, Husband asserts that the trial court's valuation of $245,000 was inflated because the court did not consider the business's tax liability. At trial, Husband's valuation expert, Randall Hebert, valued CVA at $209,335 after subtracting an approximation of the accrued income taxes due based upon the value of the accounts receivable, or $155,722. Within his valuation of $209,335, Mr. Hebert included $124,517 for CVA's alleged interest in McNeal. Mr. Hebert acknowledged that if McNeal were valued separately, the value of CVA would be reduced to approximately $85,000.

Wife's valuation expert, Shannon Farr, valued CVA at $280,852. Ms. Farr explained that the primary difference between her valuation and the valuation established by Mr. Hebert was that she did not include a deduction for income tax liability. Ms. Farr explained that she had never before seen an approximation of income tax liability deducted in a business valuation because the corporation would typically "zero out" any income to the company before the end of the year. According to Ms. Farr, CVA's annual earnings had been minimized in years prior to 2014 by CVA's issuing a bonus to Husband or through some other accepted accounting method. Therefore, Ms. Farr opined that consideration of potential income tax liability of the corporation was improper. Ms. Farr also testified that her valuation of CVA did not include any value for CVA's interest in McNeal due to the pending litigation regarding the respective ownership interests.

Following the trial court's decision to value McNeal separately, the evidence presented regarding the value of CVA ranged from approximately $85,000 to $280,852. As this Court has previously explained regarding review of the valuation of a marital asset:

> The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (internal citations omitted). The trial court herein properly valued CVA at $245,000 in accordance with the evidence presented regarding value. Inasmuch as the court's assigned value was within the range of the evidence submitted and the evidence does not preponderate against such value, we affirm the court's valuation of this asset.

Husband also argues that the trial court should have given him credit for the alleged overpayment of his temporary alimony obligation and his payment of other "marital debts." As we have fully addressed the temporary alimony issue in a prior section of this Opinion, we have affirmed the trial court's determination that Husband is due no credit. The "marital debts" of which Husband complains were detailed on a schedule presented at trial that listed "payables" to Husband and included Husband's alimony payment for June 2015, expenses for oral surgery and "Campbell Asset Management Fees," and amounts listed as "CVA for Reimbursement of Personal Expense." The trial court explicitly addressed these claimed "payables" in its Memorandum Opinion, determining:

[T]he alimony obligation is not an item for which [Husband] should receive credit (see alimony discussion). The Court finds the remaining obligations are personal obligations of [Husband] and that the CVA reimbursement items would have been taken into account by [Husband's] expert witness on valuation of CVA and, therefore, have already been considered by this Court. The Court finds the oral surgery in the amount of $745.00 and the Campbell Asset Management fees for account management are liabilities of [Husband] which should be added to his list of obligations.

Husband presented a dearth of evidence during trial regarding the claimed expenses that the trial court deemed to be Husband's personal obligations. Husband similarly presents little argument on appeal addressing why this Court should consider these items to be marital debts rather than personal ones. We conclude that this issue is without merit.

Husband further claims that while the trial court should not have factored Wife's income tax liability concerning her alimony award, it should have considered her pre-trial dissipation of assets and overspending. We note that the accrued income tax liability

related to Wife's alimony was listed on the parties' joint asset and liability statement as a marital debt, just as Husband's accrued income tax liability related to his employment was listed. Both of these amounts were considered by the trial court and listed on the court's property and debt distribution as an obligation assigned to the respective party with the tax liability. Husband has proffered no rationale why his income tax liability should be considered while Wife's should not. Furthermore, Husband's allegations regarding Wife's "dissipation" and "overspending" were thoroughly addressed and dismissed by the trial court and have also been rejected by this Court in a prior section of this Opinion. We therefore affirm the trial court's equitable distribution of property, including the equalizing payment awarded to Wife.

### VIII. Equal Membership Interests in McNeal

Husband contends that the trial court erred in awarding Wife an equal membership interest, with governing rights, in McNeal due to the history of conflict between the parties. *See Owens v. Owens*, 241 S.W.3d 478, 491 (Tenn. Ct. App. 2007) ("[P]roperty divisions are often structured to avoid, when possible, requiring divorced parties to remain in business together or to jointly own an asset that will require cooperation and mutual consent down the road."). Although Husband acknowledges the difficulty with valuation of McNeal due to the ongoing litigation regarding ownership interests, Husband asserts that there was evidence from which the trial court could have ascertained a value. Husband insists that had the court considered it necessary to avoid valuation and simply award Wife an equal interest in the business, an award to her of a financial interest only with no governing rights would have been proper.

Wife contends that the trial court properly divided McNeal membership interests equally between the parties in order to effectuate an equal, overall marital property division. We agree. Because of the ongoing, unresolved litigation among the parties and Mr. Brock regarding the respective ownership interests in McNeal, the trial court could not assign a value for this marital asset. Furthermore, the solution of awarding Wife an equal membership interest in McNeal without assigning a value was proposed by Husband's counsel at trial. In connection with the governing of McNeal, Wife argues that had she not been granted shared governing authority, Husband would basically shut her out or plunder the assets of McNeal for his own benefit. Based on the contentious history between the parties, we determine that Wife's concern is not irrational. Furthermore, the proof demonstrated that Wife had invested considerable time and energy in McNeal and should be treated as an equal member. Requiring the parties to remain in business together currently was properly ordered by the trial court. We do not determine the trial court's approach to the equal division of this asset to be in error.

## IX. Children's Educational Funds

Husband asserts that the trial court erred by failing to afford Husband any control over the children's education funds. Although Husband acknowledges that these funds were not marital property, he contends that he should have input regarding the use of the funds, claiming that Wife had improperly used the funds in the past to purchase non-educational items for the children. Wife denied any improper use of funds.

During Wife's testimony concerning these financial accounts, Husband's counsel conceded that the children were the actual owners. Husband's counsel explained that he was merely requesting the trial court to order Wife to follow the law with regard to her expenditures from these accounts. Wife stipulated that she would do so. We determine this issue to be without merit.

## X. Contempt

Wife argues that the trial court erred by failing to award her attorney's fees or impose fines for Husband's contempt. The court determined in its final order that Husband's "unilateral reductions of support and child support" were contemptuous. Although the court imposed no punishment, Wife asserts that the trial court should have awarded her additional attorney's fees or granted some other sanction against Husband.

As this Court has previously explained, "punishment imposed in contempt proceedings also lies within the sound discretion of the Trial Court." *See Huffine v. Huffine*, No. 03A01-9110-CH-00339, 1992 WL 110788, at *2 (Tenn. Ct. App. May 27, 1992). Following our thorough review of the record, we conclude that the trial court did not abuse its discretion in declining to award attorney's fees or impose sanctions specifically relating to Husband's contemptuous behavior.

## XI. Additional Attorney's Fees

Wife complains that the trial court should have awarded her additional attorney's fees due to Husband's "abusive and overwhelming" litigation strategy. As Husband correctly asserts, Wife was awarded nearly $150,000 in attorney's fees over the course of the litigation. The record is devoid of any proof regarding the amount of fees that were actually incurred by either party.

As this Court has previously explained with reference to an award of attorney's fees:

The Trial Court has wide discretion to award attorney's fees. Upon review, this Court will not interfere with an award, except upon a showing of abuse of discretion, where the evidence preponderates against the award, and a manifest injustice will be done if the Trial Court's decision is allowed to stand.

*Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001). Our thorough review of this matter does not reveal that the trial court abused its discretion regarding the attorney's fee award, or that a manifest injustice was done. Wife was awarded marital assets in excess of three million dollars, providing her with ample assets from which to pay her attorney's fees. Wife has not demonstrated that the fee amount she was awarded was insufficient.

## XII. Attorney's Fees on Appeal

Wife contends that she should receive an award of attorney's fees on appeal because the issues raised by Husband were matters within the trial court's discretion. Husband asserts that (1) Wife has sufficient assets from which to pay her fees and (2) he has raised legitimate issues on appeal. As this Court has previously elucidated:

Our supreme court has defined the factors that should be applied when considering a request for attorney fees incurred on appeal. These factors include the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered. *See Folk v. Folk*, 357 S.W.2d 828, 829 (Tenn. 1962).

*Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003).

Considering these factors, we conclude that Wife is not entitled to an additional award of attorney's fees on appeal. Although Husband's appeal was, in substantial part, unsuccessful, we determine that it was not presented in bad faith. Moreover, Wife clearly possesses the ability to pay her fees based on the assets she was awarded in the divorce.

## XIII.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment as herein modified. We modify the trial court's judgment to provide for a lien to be imposed upon Husband's assets in the amount of $540,000 in order to secure the alimony *in solido* award to Wife. We remand this matter to the trial court for a determination regarding which asset(s) would be appropriate to encumber.  We also modify the trial court's judgment by reducing the amount of Husband's court-ordered life insurance obligation from $1,000,000 to $500,000, which amount we determine to be sufficient to secure Husband's alimony *in futuro* obligation.  The judgment is affirmed in all other respects.  We deny Wife's request for an award of attorney's fees on appeal.  This case is remanded to the trial court for modification and enforcement of the divorce judgment.  Costs on appeal are taxed one-half to the appellant, Alexander Stratienko, and one-half to the appellee, Lisa Stratienko.

_____
THOMAS R. FRIERSON, II, JUDGE