IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 9, 2020 Session

## JIM DANIEL STORY, JR. v. HEIDI REBEKAH NUSSBAUMER-STORY

**Appeal from the Chancery Court for Montgomery County**
**No. MCCHCVDI 18-292      Ted A. Crozier, Chancellor**

___

### No. M2019-01705-COA-R3-CV

___

A husband challenges the trial court's award of alimony in solido to his wife for a period of eight years. Having examined the record and the trial court's analysis of the statutory factors, we find no abuse of discretion and affirm the trial court's decision. We further award the wife her reasonable attorney fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

B. Nathan Hunt and Catherine W. Cheney, Clarksville, Tennessee, for the appellant, Jim Daniel Story, Jr.

Steven C. Girsky, Clarksville, Tennessee, for the appellee, Heidi R. Nussbaumer-Story.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Jim Daniel Story, Jr., ("Husband") and Heidi Rebekah Nussbaumer-Story ("Wife") were married for thirteen years and had one child, who was eleven years old at the time of the divorce hearing. Husband was forty-eight, and Wife was forty-four at the time of the hearing. Husband filed for divorce in April 2018 alleging grounds of irreconcilable differences and inappropriate marital conduct; Wife counterclaimed alleging the same grounds. The parties resolved some issues through mediation, including Wife's status as the primary residential parent.

The remaining issues were tried at a hearing on July 29, 2019, at which both parties testified. Husband stated that he had been paying both mortgages on the marital home, totaling $2,650, every month. He proposed that the marital home be sold and the proceeds used to pay off two joint lines of credit totaling $20,500; anything left would be divided equally between the parties. Husband anticipated that the equity in the marital home would be sufficient to satisfy the two lines of credit.

Husband testified that he had been employed for five years at FirstBank as a commissioned loan officer; he was paid entirely on commission. His gross wages in 2017 were $90,043.36. Husband stated that his income fluctuated from year to year with the market. In 2018, Husband estimated, his earnings were about $61,000. In 2019, Husband was on track to have a better year, with earnings of $48,666.54 through July 15. Based on this figure, Husband predicted he would make around $100,000 in 2019. On the child support worksheet, Husband's monthly income of $6,458.33 was based on the average of his income in 2017 and 2018.

Husband affirmed that Wife was in an automobile accident in 2015. Asked to describe her injuries, Husband stated that Wife had thoracic outlet syndrome and had surgery in an effort to correct that condition. Husband testified that, at the time of the accident, Wife had "a couple different part-time jobs" as a nurse practitioner. On cross-examination, Husband was asked how Wife's injuries from the car wreck manifested themselves. He testified:

A. She said she can't feel her right arm. You know, she says it hurts all the time; you know, things like that.
Q. And is that what you personally observed yourself during this marriage?
A. Yes.
Q. Okay. And did that affect her ability to just generally enjoy life?
A. Yes, sir.
Q. Did it affect her ability to, in a large part, to work?
A. Yes, sir.

Husband agreed that it was his "intent and one of [his] goals was to make sure, for the most part, that she could stay at home."

Husband testified that, in addition to paying both mortgage payments throughout the marriage, he had made his car payment. For the last four years, he also paid the $726 monthly payment on Wife's car. When she worked, Wife "would usually pay the electric bill and the gas and water." Husband had given Wife one-half of the proceeds from his sale of speculative homes, about $22,400; the last speculative home Husband built was in 2017.

In 2012, Husband was put on an exclusionary list for Freddie Mac loans. He was ultimately removed from the list and was able to start working as normal again. During the period that he was unable to make Freddie Mac loans, however, Husband took out approximately $90,000 in unsecured debt to finance the parties' normal expenses. Husband testified that the total monthly payments on the $90,000 debt were about $1,200 and that he was willing to be fully responsible for that debt.

At the mediation, the parties agreed that Wife would receive property on Antioch Church Road and assume the payments on the property.

Wife testified that her parents lived across the street from the marital home. She attributed the breakdown of the marriage mainly to Husband's theft of her mother's opioid prescription drugs, lying about his use of alcohol, and his treatment of the parties' daughter. The parties separated in January 2018, and Wife moved in with her parents.

According to Wife, she was unaware of Husband's $90,000 in unsecured debt because "[h]e took care of all of the financial stuff." She was aware there was a line of credit associated with their checking account, but she did not have access to a credit card. Wife would have to call Husband if she needed to use the card to pay for something.

Wife graduated from Austin Peay with an undergraduate degree in health and human performance and then studied at Vanderbilt to obtain a master's degree in nursing. She was certified as a nurse practitioner with licensure as a registered nurse. Wife was not employed at the time of the hearing. From 2010 until shortly before trial, Wife worked as a nurse practitioner for Achieve Medical Weight Loss ("Achieve") in Clarksville and Paducah.

Wife testified that, in 2015 or 2016, she resigned her position at Achieve to take a higher paying position with Dr. Daugherty at the Veincare Clinic in Clarksville, where she worked for two years. She stated that, "I was in and out at that time working six days a week between different jobs because I had to make more money after the situation that we talked about [an apparent reference to Husband's financial problems]." Prior to working for Dr. Daugherty or at Achieve, Wife was a urology nurse practitioner in women's health "for years and years until I had Hadley so I could—I change to the medical weight loss so I could be at home with her more."

When asked about her highest grossing year, Wife testified that she believed it was "probably around 2016" that she made around "80 some-odd thousand." She was asked to confirm whether this was after her automobile accident, Wife expressed some confusion. She stated that she was in a car accident in November 2014, which she thought was at the time when she had to increase her work "[b]ecause of the finances of the household." Wife revised her answer to say that her peak earnings of $80,000 were probably around 2014. The accident occurred on a day when Wife worked at the Achieve clinic in Paducah,

Kentucky; she would drive four hours each way and work eight to ten hours in the clinic. Wife testified that she was also working at a urology clinic a couple of days a week. She was working six days a week in two different jobs.

The accident happened when Wife's car was rear-ended by another car. She experienced neck pain and, after ten or eleven months, she was diagnosed with bilateral thoracic outlet syndrome. Wife described the condition as "severe whiplash," in which the muscles and tissues are torn. As the muscles and tissues heal, Wife stated, they "scar down" and trap the brachial plexus nerve, causing severe arm pain. Wife could not hold her arm up for long periods of time. She stated that, when she tried to do patient exams, her arm "would go heavy and would go down." Once she was properly diagnosed, Wife saw a thoracic surgeon at Vanderbilt who did complex surgery on the muscles in her neck and released the impinged nerve. Wife testified that she retained permanent nerve damage. She could not feel her right hand and arm and had a problem with dropping things.

Wife stated that "the pain started getting worse" and that she "felt like I was on fire." After another year or so, she was diagnosed with a rare chronic neuroinflammatory disorder, CRPS, which was caused from the surgery where the nerve was cut. The disease affects both of Wife's arms and her neck. According to Wife, if the disease progresses, a person can eventually "end up in a wheelchair."

When asked to describe her current limitations, Wife testified that she still had pain and could not feel her right hand. She was limited in her ability to lift with her right arm and could not write more than a few words with her right hand without spasms. This affected her ability to give injections or do procedures. Wife testified, "You have to have two hands to palpate and feel that." Moreover, she could not hold her arm up for very long. Further addressing her ability to do her job as nurse practitioner, Wife stated:

> [T]hat's why I had to quit Dr. Daugherty's vein clinic, because part of the exam was I had to lift my arms up to examine the patient. I couldn't do it— muscle spasms, things of that nature—and then that's why I ended up going less hours back to Achieve.

The position at Achieve was less strenuous physically than a typical nurse practitioner position, Wife testified. There is a chart that the nurse practitioner must fill out with checkmarks, and Wife had to stop frequently to complete the form. Wife stated that she was no longer able to keep up with the pace at Achieve. Because of the CRPS, her right hand stayed colder and painful, which affected her work.

Wife testified that her last day at Achieve was the previous week. The clinic was implementing new protocols requiring her to push vitamins and "other things" that Wife considered unethical. For example, she was expected to prescribe phentermine to a patient

with a heart monitor. Wife stated that, as an ethical matter, she would not prescribe treatment "when the risks outweigh[ ] the benefits."

Wife's W-2 from 2018 showed gross wages of $5,747. When asked why her earnings were so low, Wife cited the fact that she was homeschooling her daughter, "trying to get us to a safe place," and her own physical limitations. Her year-to-date earnings through June 14, 2019 were $12,765.

Wife testified that her ability to earn was greatly limited due to her physical condition. She could not type, which was a skill required for many nursing positions. Wife stated that she was trying to figure out other types of work she could do.

Wife submitted a statement of income and expenses showing total monthly expenses of $5,935; this figure does not include the child's separate expenses. She was living with her parents at the time of the hearing but hoped to get a place of her own, and her statement included $1,000 for rent/mortgage. The medical expenses of $888 did not include the infusions for Wife's chronic neuroinflammatory disorder. The infusions were listed as a separate category for $500.

On cross-examination, Wife clarified that, from the parties' marriage in 2006 until the birth of their child in 2008, she worked full-time as a nurse practitioner. Between 2008 and the November 2014 car accident, she returned to work full-time during the period when Husband's earnings were reduced due to the Freddie Mac inquiry. Wife still could not identify the year during which she made her highest earnings. She stated that "it was that year whenever I had to go back to work six days a week." She acknowledged that, after the wreck, there were some months that she continued to work full-time; her "condition progressively declined."

Wife admitted that she had a long-term disability policy that she had had for about twenty years. She had never made a claim against the policy. Wife testified that she did not make a claim against the policy after the car wreck because "I didn't want to be disabled; I wanted to be a nurse practitioner." Moreover, Husband "wanted me to stay at home," so she was not attempting to work full-time.

In a final decree of divorce entered on September 3, 2019, the trial court granted the parties a divorce on the ground of irreconcilable differences and ordered that the marital home be sold with any equity remaining after the payment of debts to be divided equally between the parties; if the equity was not sufficient to cover all of the debts and costs, Husband was to be responsible for the remaining debt.

With respect to the parties' income, the trial court made the following findings:

> Wife is a licensed nurse practitioner and Husband is a mortgage loan officer with First Bank in Dickson, Tennessee. The Court finds that Wife's ability to earn an income has been reduced due to injuries Wife sustained in an automobile accident that occurred in November 2014. However, the Court finds Wife's testimony regarding her injuries and ability to work following the accident to be inconsistent and Wife also testified that she has a private long-term disability policy that has been in effect for twenty (20) years, but that she did not make a claim under this policy or make a claim for Social Security disability benefits following the accident and has no intent [to] do so. Accordingly, the Court finds that Wife should be imputed with an income of $4,500.00 per month for purposes of child support calculation and the Court further finds that Husband's income should be set at $95,000.00 per year or $7,916.00 per month for purposes of child support calculation.

The court further ordered that Husband was solely responsible for approximately $90,000.00 in unsecured debt he incurred during a period of time when he was unable to work as a mortgage banker.

The trial court ordered Husband to pay Wife $1,100.00 per month in alimony in solido for a period of eight years. As we will discuss below, the court cited the significant difference in earning capacity between Husband and Wife, the parties' decision for Wife to stay home and homeschool their child during the marriage, Wife's need for alimony due to her physical condition, and Husband's ability to pay. The court set child support at $768.00 per month and awarded Wife $3,875.00 in attorney fees.

On appeal, Husband argues that the trial court erred in awarding alimony to Wife. Wife asserts that the trial court properly exercised its discretion and seeks her attorney fees on appeal.

STANDARD OF REVIEW

A trial court has "broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011); *see also Mayfield v. Mayfield*, 395 S.W.3d 108, 114 (Tenn. 2012). The *Gonsewski* Court described the standard of review appellate courts apply to a trial court's award of spousal support:

> [A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew* [*v. Burlew*], 40 S.W.3d [465,] 470 [Tenn. 2001]; *Robertson v. Robertson*, 76 S.W.3d 337,

340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Gonsewski*, 350 S.W.3d at 105-106 (footnote omitted). To avoid a result-oriented decision, our review of a trial court's discretionary decision should determine "whether there is a factual basis for the decision in the record, whether the court properly identified and applied the applicable legal principles, and whether the decision is within the range of acceptable alternative dispositions." *Cain-Swope v. Swope*, 523 S.W.3d 79, 95 (Tenn. Ct. App. 2016); *see also Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

ANALYSIS

I.    Alimony in solido.

Husband argues that the trial court erred in awarding Wife alimony in solido in the amount of $1,100 per month for eight years.

Under Tennessee law, four types of alimony are available: rehabilitative alimony, alimony in futuro, transitional alimony, and alimony in solido. Tenn. Code Ann. § 36-5-121. The General Assembly has stated its preference that rehabilitative alimony be awarded

when appropriate. *See* Tenn. Code Ann. § 36-5-121(d)(2).[1] Where one spouse is economically disadvantaged when compared with the other spouse and rehabilitation is not possible, however, "the court may grant an order for payment of support and maintenance on a long-term basis or until death or remarriage of the recipient . . . ." Tenn. Code Ann. § 36-5-121(d)(3); *see also* Tenn. Code Ann. § 36-5-121(d)(4) (providing that award of alimony in futuro may be made "where rehabilitation is not feasible").

Alimony in solido is a form of long-term support and may include attorney fees. Tenn. Code Ann. § 36-5-121(h)(1). It is not modifiable in the absence of the parties' mutual agreement and does not terminate upon the remarriage or death of the recipient or the obligor. Tenn. Code Ann. § 36-5-121(h)(2)-(3). Alimony in solido constitutes "an award of a definite sum of alimony and 'may be paid in installments provided the payments are ordered over a definite period of time and the sum of the alimony to be paid is ascertainable when awarded.'" *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2001) (quoting *Waddey v. Waddey*, 6 S.W.3d 230, 232 (Tenn. 1999)); *see also* Tenn. Code Ann. § 36-5-121(h)(1). Alimony in solido can be combined with other types of alimony awards, Tenn. Code Ann. § 36-5-121(d)(5), and it is "often awarded to adjust the division of marital property." *Burlew*, 40 S.W.3d at 472.

A trial court is directed to consider the factors set forth at Tenn. Code Ann. § 36-5-121(i) in determining whether to award alimony to a party. The two most important factors a court is to consider are the need of the disadvantaged spouse and the ability of the obligor spouse to pay the support. *Gonsewski*, 350 S.W.3d at 110. The trial court in the present case quoted the statutory factors and analyzed them as follows:

> *(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources.*
> The Court[] finds there to be a significant difference in the relative earning capacity of the parties as previously set forth in paragraph 5[2] herein.

---

[1] Tennessee Code Annotated section 36-5-121(d)(2) states:

> It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

[2] The paragraph 5 referenced here is the paragraph quoted in the opening section of this opinion in our summary of the trial court's decision.

*(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level.*

The Court finds that Wife is highly educated as she has a master's degree in nursing. There was no testimony presented regarding Husband's education and training, although he has been a mortgage loan officer for a number of years.

*(3) The duration of the marriage.*

The parties were married for 13 years and the Court finds this to be a significant duration, but certainly not the same as a 30 or 40 year marriage.

*(4) The age and mental condition of each party.*

Husband is 48 years of age and Wife is 44 years of age at the time of this divorce. The Court did not find that either party had any mental impairments.

*(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease.*

Wife's physical condition was previously set forth in paragraph 5 herein. The Court did not hear any evidence regarding Husband's physical condition.

*(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage.*

The Court finds that it was the parties' desire for Wife to primarily stay at home and raise the child, although Wife had worked outside of the home during the parties' marriage as a nurse practitioner.

*(7) The separate assets of each party, both real and personal, tangible and intangible.*

The Court finds that the parties really have no separate assets other than Husband's Picasso print/painting previously described herein.

*(8) The provisions made with regard to the marital property, as defined in § 36-4-121.*

The Court does not find this factor to be applicable in this case.

*(9) The standard of living of the parties established during the marriage.*

The Court finds that the parties had a good standard of living during their marriage, although the Court finds that the parties were living above their means as reflected by the marital debt of the parties as previously described herein.

*(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party.*

The Court finds that Wife stayed at home during the parties' marriage to raise their minor child, who Wife homeschools, and that Husband was traditionally the breadwinner during the marriage.

*(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so.*

The Court finds that there was some testimony that Husband may have had an issue with alcohol or prescription drugs in the past, but that Husband appeared to have no issues at the time of trial. Further, the Court is declaring the parties divorced pursuant to Tenn. Code Ann. § 36-4-129(b).

*(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.*

The Court does not find there to be any tax consequences to the parties. The Court further finds that Wife is a licensed nurse practitioner, who can make a lot of money and was not convinced by Wife otherwise. However, the Court finds that Wife does have some need for alimony due to her medical condition and that Husband does have an ability to pay.

Despite its conclusion that Wife had the ability to earn more than she asserted at trial,[3] the trial court determined that she had a need for alimony and that Husband had the ability to pay alimony. The court's analysis shows that it placed emphasis on the difference in earning capacity between the parties, Wife's physical condition, and the parties' decision during the marriage for Wife to stay home and homeschool their child.

### Need and ability to pay

Husband cites *Ingram v. Ingram*, No. W2017-00640-COA-R3-CV, 2018 WL 2749633, at *4 (Tenn. Ct. App. June 7, 2018), a case in which this Court affirmed the trial court's decision to award alimony to the wife, who was unable "to work in the public sector due to her back injury." Husband argues that the present case is distinguishable from *Ingram* because the wife in *Ingram* sustained a physical disability in a car accident and needed alimony whereas, here, Wife "testified at trial that she had her peak earning year of $80,000.00 two (2) years after her accident." *Ingram*, 2018 WL 2749633, at *4. Furthermore, Husband argues, the trial court in *Ingram* found that the wife could not earn more than her current income, whereas the trial court in the present case found that, as a nurse practitioner, Wife "can make a lot of money." *Id.* As Husband states, the trial court in the present case found Wife's testimony regarding her post-accident income inconsistent. Yet, the trial court determined "that Wife's ability to earn an income has been reduced due to injuries Wife sustained in an automobile accident that occurred in November 2014." The trial court found that Wife could earn $4,500.00 per month, significantly more than the approximately $2,000 a month she contended at trial. Moreover, Husband's testimony corroborated Wife's allegations that her injuries from the car accident affected her significantly. He acknowledged that her injuries affected her ability to enjoy life and her ability to work. He further testified:

---

[3] In her income and expense statement submitted at trial, Wife imputed to herself a gross monthly income of $2,080.00.

A. She said she can't feel her right arm. You know, she says it hurts all the time; you know, things like that.
Q. And is that what you personally observed yourself during this marriage?
A. Yes.

Taking all of the issues raised by Husband into account, the trial court decided to award alimony to Wife, as in *Ingram*.[4]

Husband's brief addresses the finances of both parties. It is noteworthy that the record contains a statement of income and expenses submitted at trial by Wife, but no such statement from Husband. Therefore, we are left to piece together the evidence regarding Husband's expenses. Husband discusses his responsibility for the two mortgages on the marital home pending the sale of the property, payment of the debts, and division of any remaining equity. We will not, however, include such non-continuing expenses in Husband's expenses for purposes of calculating his ability to pay alimony. *See Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *12 (Tenn. Ct. App. June 29, 2015) (approving of trial court's reduction of wife's expenses where several "were shown to be non-continuing due to the impending sale of the marital residence and lake lot"). Based upon the record, Husband's regular monthly expenses include: a car payment of $532, debt payments of $1,200, child support of $768, alimony of 1,000, and a mortgage payment of $1,500 (according to Husband's brief); these figures total $5,100. As Husband asserts, these figures do no include the cost of health insurance. (They also do not include the cost of gas or food.) The trial court found Husband's monthly income to be $7,916, leaving $2,816 for other expenses. Thus, he has the ability to pay the amount of alimony ordered by the court.

Wife's statement of income and expenses shows expenses totaling $5,935. This amount includes $600 for health insurance; $888 for medical, dental and drugs; and $500 for infusions.[5] The trial court did not discredit the expenses submitted by Wife. With an income of $4,500 a month and expenses of $5,935 a month, the record supports the trial court's finding concerning Wife's need for alimony.

*Standard of living*

Husband asserts that he should not be expected to provide Wife with "a post-divorce standard of living that is not available to him post-divorce, and which Wife has not convinced the trial court she is incapable of maintaining herself." He cites the trial court's

---

[4] Husband also asserts that Wife's failure to file a claim on her disability insurance policy evidences the lack of severity of her physical limitations. The disability policy does not appear in the record and, therefore, this court is not able to draw any conclusions as to the requirements or benefits of such a policy.

[5] Wife testified that the infusions improved the burning and pain caused by chronic neuroinflammatory disorder, but the effects wore off with time.

finding that the parties were living above their means during the marriage. Based upon our analysis of the parties' respective income and expenses, it does not appear that Wife will be enjoying a standard of living comparable to that enjoyed by the parties during the marriage or equivalent to Husband's post-divorce standard of living.

Husband cites the case of *Shadoin v. Shadoin*, 1986 WL 8975 (Tenn. Ct. App. Aug. 20, 1986), in support of his argument that the alimony award is excessive. In that case, however, this court determined that "the trial court has ordered Mr. Shadoin to assume a financial burden he is presently unable to assume." *Shadoin*, 1986 WL 8975, at *3. Although the wife in *Shadoin* argued that her economic position should not suffer due to the divorce, the appellate court held that the principle that "a divorce should not inflict undue economic hardship upon an innocent spouse" must be tempered by the other statutory factors. *Id.* Under the facts at hand, therefore, the court reduced the husband's monthly obligation and recognized that, as a result, the wife would have to "choose between adjusting her standard of living and entering the job market again." *Id.* at *3-4.

The facts in the present case differ from those in *Shaolin*. As detailed above, Husband has the ability to pay the alimony ordered by the trial court. Even at the amount ordered by the trial court, Wife will likely have to adjust her standard of living and find a way to return to the work force.

*Provisions regarding marital property*

Husband contends that, with the trial court's division of marital property as well as the other awards of alimony in solido, the award of $1,100 a month in solido is inequitable. We disagree.

As Husband points out, "alimony *in solido* is recognized as a form of long-term support that may be used to adjust a marital property distribution or to provide financial support to a spouse." *Stratienko v. Stratienko*, 529 S.W.3d 389, 406 (Tenn. Ct. App. 2017). Husband objects to the award of $1,100 to Wife for a period of eight years in large part because of the trial court's award of $90,000 in alimony in solido to cover the unsecured debt owed by Husband, as well as the award of $3,875.00 in attorney fees also designated as alimony in solido. According to Husband's reasoning, "Wife walked away from the marriage with a total alimony in solido award of $199,475.00." This argument is based upon the erroneous assumption that the $90,000 alimony in solido award is payable to Wife; it is not. The trial court ordered that "the unsecured debt that Husband incurred during the marriage in the approximate amount of $90,000.00 shall solely be Husband's debt and . . . this shall be considered alimony *in solido*." Husband is obligated to pay the creditors in order to extinguish these debts and to hold Wife harmless. Rather than alimony in solido, this obligation is more accurately characterized as a division of marital debt. Although some of the debt may have been incurred to pay for marital expenses, Husband

requested that these debts be assigned to him and presented no evidence concerning the purposes for which the debt was incurred, the amounts owed, or the identity of the creditors.

Husband also points to Wife's receipt of half of the profits from speculative homes he built during the marriage and his payment of many of Wife's expenses during the pendency of the divorce proceedings. These expenditures are not relevant for purposes of determining the equitableness of the alimony award as they occurred while the parties were still married.

In sum, the trial court analyzed all of the statutory factors and determined that Wife had a need and Husband had the ability to pay alimony in the amount of $1,100 a month for a period of eight years.[6] We find no basis for concluding that the trial court abused its discretion in making this determination.

## II. Attorney fees.

Wife requests that we award her attorney fees on appeal. Tennessee Code Annotated section 36-5-103(c) was amended in 2018 and now states:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

This subsection "provides statutory authority for this Court to award appellate attorney fees to a prevailing party." *St. John-Parker v. Parker*, No. E2018-01536-COA-R3-CV, 2020 WL 1491371, at *20 (Tenn. Ct. App. Mar. 27, 2020) (citing *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017)).

As the Supreme Court explained in *Eberbach v. Eberbach*, the appellate court is to exercise its discretion to determine whether an award of attorney fees is appropriate in a particular case. *Eberbach*, 535 S.W.3d at 477. We hereby exercise our discretion in this case to award Wife the reasonable fees she has incurred in defending Husband's appeal.

---

[6] We note that the parties' minor child will reach majority in approximately eight years.

- 13 -

CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for further proceedings to determine an award of attorney fees. Costs of appeal are taxed to the appellant, Jim Daniel Story, Jr., and execution may issue if necessary.


_____

ANDY D. BENNETT, JUDGE