FILED
12/22/2025
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 8, 2025 Session

## CYNTHIA ALLEN WEST v. RODERICK JAY WEST

**Appeal from the Chancery Court for Sumner County**
**No. 2022DM-244      Louis W. Oliver, Chancellor**

_____

### No. M2024-00957-COA-R3-CV

_____

This is an appeal from a final decree of divorce. The trial court found that the wife was economically disadvantaged, that it was not feasible for her to be rehabilitated, and that she had no meaningful earning capacity. Therefore, the court awarded the wife alimony in futuro. The court also conducted an equitable division of the couple's marital property. The husband appealed. We have determined that the trial court did not abuse its discretion in finding that the wife could not be rehabilitated. However, the court failed to consider all of the wife's sources of income and to make sufficient findings. Therefore, we vacate the court's alimony award and remand for further proceedings. We decline to award the wife her appellate attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Joshua G. Strickland and D. Scott Parsley, Nashville, Tennessee, for the appellant, Roderick Jay West.

Helen Sfikas Rogers and Stella Kamm Mallinak, Nashville, Tennessee, for the appellee, Cynthia Allen West.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

In November 2022, Cynthia West ("Wife") filed a complaint for divorce against Roderick West ("Husband"). The couple had one adult child, Raven, when Wife filed for divorce. Wife alleged that Husband had committed inappropriate marital conduct and that

the couple had irreconcilable differences. She also sought an award of alimony, an equitable division of the parties' marital property, and an award of her reasonable attorney's fees.

A trial on the complaint was held in April 2024. At that time, Wife was 58 years old, and Husband was 52. The evidence showed that the parties met while they were living in Memphis, Tennessee. Wife completed a three-year nursing program but did not have any further education. Husband received a Master of Business Administration degree from Emory University. Early in the parties' relationship, Husband moved from Memphis to Atlanta, Georgia to be a business consultant. In 2001, Wife followed Husband to Atlanta so that Raven could be closer to Husband. Wife initially was employed as a nurse in Atlanta; she later ceased working as a nurse and managed a hair salon and massage business started by Husband. Wife was also Raven's primary caregiver. The parties were married in Georgia in 2002.

The family moved to Tennessee in 2005 for Husband to take a position at Dollar General's corporate office. Wife initially worked part-time as a medical case manager and, in 2007, worked full-time as a case manager. This was the last time Wife was employed, and she has since allowed her nursing license to lapse. For most of the marriage, Wife was a homemaker, caring for Raven and Husband's elderly parents. Wife also supported Husband in his position at Dollar General. By all accounts, Wife lived an active lifestyle; however, she testified that she suffered from osteoarthritis, back pain, and was pre-diabetic. Because of her physical limitations and the time since she was last employed, Wife testified that she did not intend to return to active employment after the divorce and that she and Husband considered her to be retired.

Husband remained employed with Dollar General, where he was the Executive Vice President of Global Supply Chain, overseeing distribution centers in eighteen states and earning a significant salary, which exceeded one million dollars in several years. Husband's compensation also included the potential for significant bonuses. In addition, Husband was compensated with various forms of equity in Dollar General, including awards of stock options, performance stock units ("PSUs"), and restricted stock units ("RSUs"). Husband testified that he hoped to retire from Dollar General and that the typical retirement age for individuals in his type of position was 62.

Because of Husband's complex compensation package, a large portion of the trial consisted of testimony from two financial experts, Vic Alexander (for Husband) and Kurt Myers (for Wife). The two experts were retained to provide an analysis of Husband's compensation, the feasibility and implications of potential divisions of property, and Wife's earning capacity. Both experts provided detailed reports regarding their findings, the relevant portions of which will be detailed later in this opinion.

After the close of proof, the trial court took the matter under advisement. On June 7, 2024, the court entered an order, declaring the parties to be divorced on the ground of irreconcilable differences. After considering the relevant statutory factors, the court divided the parties' property. Wife was awarded the marital home, valued at $1,600,000.[1] Wife was also awarded a second property,[2] subject to the existing mortgage, two vehicles, and the couple's golf club membership. The court also awarded Wife a significant amount of financial assets, including half of Husband's Dollar General Stock and Option Account ("the Dollar General account"), which contained the awards of PSUs, RSUs, and stock options. Wife's share of this account was valued at $1,145,016. Wife was also awarded all of Husband's 401(k) plan, a brokerage account, two IRA accounts, and several bank accounts. In total, each party's share of the marital estate was valued at just under $5,500,000.

The trial court turned next to whether Wife should be awarded alimony and, if so, what type. The court considered the statutory factors found in Tenn. Code Ann. § 36-5-121(i) and concluded that Wife had suffered economic detriment for the benefit of the marriage and was economically disadvantaged. Because of Wife's physical limitations and the amount of time it would take for her to be able to resume nursing, the court concluded that the rehabilitation of Wife was not feasible and that she would be unable to achieve an earning capacity that would permit her standard of living to compare to the standard of living during the marriage or to Husband's post-divorce standard of living. The court also found that transitional alimony would be inappropriate. Therefore, the court determined that an award of alimony in futuro was appropriate.

Because of the decision to award Wife alimony, the court turned next to Wife's need. After finding that Wife's only source of income would be the $900 in rental income from the property she was awarded, the court concluded that "Wife should not be required to utilize her division of the marital estate to provide for her current needs, thereby depleting her share of the marital estate." After determining that two of the expenses claimed by Wife—donations to her church and contributions to her IRA account—were not appropriate considerations for determining her need and deducting these amounts from her claimed need, the court found that Wife needed $13,908 per month. The court found that Husband possessed ample income available to support Wife and awarded her $14,000 per month to be paid until her death, cohabitation with another adult in a romantic relationship, or remarriage.[3]

---

[1] Husband had previously taken out a Home Equity Line of Credit ("HELOC") against the home to pay for Raven's education expenses. Husband was ordered to pay off this loan using his share of the marital estate.

[2] Wife's extended family resided in this second property and paid her $900 in rent each month.

[3] On Wife's request for attorney's fees, the court concluded that Wife's fees paid up to the entry of the final decree were to be considered marital debt, and the remaining unpaid fees were to be her responsibility.

On June 28, 2024, Wife filed a motion to alter or amend the judgment, the relevant portion of which concerned the court's decision to split the Dollar General account. Wife asserted that, when Husband exercised and cashed out his equity awards, "they would be paid to [Husband] thus, there was no mechanism pursuant to the Court's Order for the payment to the [Wife] or any ability for her to trigger, if needed, the sale of any of the stock and or stock options she was awarded." Therefore, Wife requested that the order be modified to require Husband to pay half of the value of these awards to her. In response, Husband asserted that, because of his position at Dollar General, the division of the vested stock could only occur during an open securities trading window for which he had received pre-clearance. Therefore, Husband suggested that the order be modified to require him to seek pre-clearance within five business days of the next window and convey half of the value of the vested stock and options, less taxes and fees, to Wife. Regarding the unavailable RSUs, PSUs, and options in the account, Husband asserted that he had no right to them "until they possibly vest in the future, potentially have value and [Husband] completes all the conditions of them vesting," which had not occurred as of the day of the divorce hearing or the entry of the final order. Husband asserted that "this is future income based on the future potential performance of the company that may be received post the date of the divorce order."

On September 13, 2024, the court entered an order modifying the prior order to direct Husband to convey half of the value (as valued on the date of execution) of the available stocks and exercised options Husband had been awarded through June 7, 2024, to Wife during the next open securities trading window for which Husband received pre-clearance. Regarding the unavailable PSUs, RSUs, and options, the court found that Husband had no ownership rights in them until they possibly vested in the future. The court reiterated that Wife was awarded half of the value of the unavailable shares but modified the order to direct Husband to convey half the value of the unavailable shares upon them becoming available, in accordance with the same pre-clearance requirements as the available shares. The court also ordered Husband to provide a yearly accounting of the unavailable shares to Wife.

Husband timely appealed and presents the following issues for our review: (1) whether the court erred in finding that Wife had no meaningful earning capacity and failing to consider income to Wife from all sources; and (2) whether the trial court erred in awarding Wife alimony in excess of her need. Wife presents the additional issue of her fees and costs incurred on appeal.

---

Wife had been paying her attorney's fees from a marital bank account, so no further award was necessary. Husband had also been paying his fees out of a marital bank account, but the court determined that his fees were to be his responsibility, and the court later entered an order directing Husband to pay one-half of the fees he paid out of the marital accounts to Wife to compensate her for those fees.

STANDARD OF REVIEW

Trial courts are "accorded wide discretion in determining matters of spousal support." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). This discretion extends to whether support is needed, as well as the nature, amount, and duration of an award. *Id.* Because of the factually intense nature of these cases, "the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support." *Mayfield v. Mayfield*, 395 S.W.3d 108, 114 (Tenn. 2012) (citing *Gonsewski*, 350 S.W.3d at 105)). Indeed, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision" absent a lack of evidentiary support or public policy concerns. *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998).

When reviewing a court's award of spousal support, appellate courts apply the abuse of discretion standard. *Gonsewski*, 350 S.W.3d at 105. "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* Our review of discretionary decisions "should presume that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.* at 105-06. "Appellate review of findings of fact by the trial court are 'de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise.'" *Id.* at 105 n.5 (quoting TENN. R. APP. P. 13(d)).

ANALYSIS

We begin our analysis by considering Husband's arguments regarding the trial court's award of alimony in futuro to Wife. We first consider whether the trial court erred by finding Wife could not be rehabilitated. We then consider whether the trial court failed to consider all sources of income to Wife. Finally, we consider Wife's request for her appellate attorney's fees.

I. Alimony

The issues raised by Husband concern the award of alimony to Wife. Courts in Tennessee are authorized by our legislature to award alimony in divorce cases "according to the nature of the case and the circumstances of the parties." Tenn. Code Ann. § 36-5-121(a). Courts may award long-term alimony, referred to as alimony in futuro, "[w]here there is relative economic disadvantage and rehabilitation is not feasible." *Id.* § 36-5-121(d)(3). To assist courts in making alimony determinations, our legislature has set out

factors[4] courts "shall" consider. *See* Tenn. Code Ann. § 36-5-121(i). "In general, use of the word 'shall' in a statute indicates that the statutory provision is mandatory, not discretionary." *Emory v. Memphis City Sch. Bd. Of Educ.*, 514 S.W.3d 129, 144 n.11 (Tenn. 2017).

One factor courts must consider is "[t]he relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources." Tenn. Code Ann. § 36-5-121(i)(1). Therefore, the statute dictates that courts must consider a person's income from all sources available to him or her when determining whether to award alimony. Potential income presents a factual question. *Blount v. Blount*, 720 S.W.3d 295, 332 (Tenn. Ct. App. 2024) (quoting *Levy v. Levy*, No. W2023-01124-COA-R3-CV, 2024 WL 3747842, at *5 (Tenn. Ct. App. Aug. 12, 2024). "Earning capacity means '[a] person's ability or power to earn money, given the person's talent, skills, training, and experience.'" *Id.* at 335. "[D]etermining a party's earning capacity 'requires consideration of the party's circumstances and qualifications, including their age, past and present employment, education and training, and ability to work.'" *Id.* (quoting *Levy*, 2024 WL 3747842, at *5.

Husband asserts that the trial court erred in finding that Wife had no earning capacity. Husband's argument is twofold. First, he asserts that the court erred by finding that Wife could not be rehabilitated. Second, he asserts that the trial court erred by not considering all sources of income to Wife, specifically investment income Wife will have access to as a result of the property division.

### A. Could Wife be rehabilitated

We first consider whether the trial court erred in finding that it was not feasible for Wife to be rehabilitated. Husband contends that Wife could return to work as a nurse (and be rehabilitated) but would, instead, choose not to, thereby being voluntarily underemployed. Because of this, Husband contends, the court should have deducted Wife's potential income from her need.

Underemployment that is willful and voluntary may affect an award of alimony because the statute directs courts to consider "earning capacity," rather than actual earnings. *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *4 (Tenn. Ct. App. Jan. 28, 2010) (citing *Lightfoot v. Lightfoot*, No. E2001-106-COA-R3-CV, 2001 WL 1173297, at *6 (Tenn. Ct. App. Oct. 4, 2001)). As explained by this Court:

---

[4] Notwithstanding this list of enumerated factors, courts generally consider the economically disadvantaged spouse's need and the obligor spouse's ability to pay to be the most important considerations. *Pearson v. Pearson*, No. W2018-01188-COA-R3-CV, 2019 WL 2394247, at *4 (Tenn. Ct. App. June 6, 2019). "[T]he primary consideration is the disadvantaged spouse's need." *Id.*

"When called upon to determine whether a person is willfully and voluntarily unemployed or underemployed, the courts must consider the person's past and present employment, as well as the reasons for the unemployment or the taking of a lower paying job. If the decision for unemployment or for taking a lower paying job is reasonable, the court will not find the person to be willfully and voluntarily underemployed."

*Chase v. Chase*, 670 S.W.3d 280, 293 (Tenn. Ct. App. 2022) (quoting *Byrd v. Byrd*, 184 S.W.3d 686, 691 (Tenn. Ct. App. 2005)). This applies to both the obligor and obligee spouse. *Id.* The question of whether a party is willfully unemployed presents a question of fact. *Blount*, 720 S.W.3d at 333.

On appeal, Husband argues that the trial court's finding that Wife could not feasibly return to work as a registered nurse was unsupported by the evidence because "there was no medical proof [that] Wife cannot work." We disagree that the evidence preponderates against this finding. While we acknowledge that there was no expert medical testimony regarding Wife's health, she testified regarding her physical limitations, and the trial court credited this testimony. *See Chase*, 670 S.W.3d at 294 (crediting a wife's testimony regarding her health in finding it to be reasonable for the wife to not return to work). Indeed, regarding Wife's health, the court found that she suffered from osteoarthritis, back pain, was pre-diabetic, and that she was in "good mental health but limited physical health." Based upon these findings, the court concluded that "[d]ue to Wife's physical issues, Wife may be limited in performing traditional nursing duties in treating patients, even though Wife had testified that her most recent RN job did not involve directly administering to patients." The evidence presented at trial does not preponderate against these findings.[5]

Further, beyond his bare assertions that the evidence does not support the court's conclusion, Husband does not point to any evidence contradicting the court's findings other than testimony by Wife's expert that he recalled her testimony that she was not disabled and what he believed her potential salary would be. This testimony is insufficient to overturn the court's findings. *See Chase*, 670 S.W.3d at 294 (noting that a husband presented "no evidence" aside from an expert's testimony that there were relevant jobs available "in the area" to establish the wife would be able to procure employment after a hiatus). Husband did not present sufficient evidence at the trial to contradict Wife's assertion, which the court credited, that she could not reasonably return to work.

---

[5] Husband directs us to the case of *Small v. Small*, in which this Court found the evidence presented at trial preponderated against the trial court's finding on a wife's earning capacity. 2010 WL 334637, at *7. However, this case addressed whether the evidence presented at trial preponderated against the court's finding of what the wife could earn, not whether the wife could return to work. It appears from the opinion that it was undisputed that the wife was able to return to the workforce. *See id.* at *6-7. Instead, the issue was whether the trial court's finding on the wife's potential income was supported by the evidence, and this Court concluded that the wife had not presented evidence to support the trial court's conclusion. *Id.* at *7. Thus, we find this case to be unsupportive of Husband's position.

Husband's assertion also understates the basis for the trial court's conclusion. A review of the final order reveals that the determination regarding Wife's ability to resume working as a nurse was based on numerous other considerations, including her age, the period of time necessary for her to complete the education required for her to reactivate her nursing license, and the extent of her absence from the workforce. These were all factors within the trial court's discretion to consider. *See Byrd*, 184 S.W.3d at 691. Indeed, Wife was 58 years old at the time of the trial and had not been employed since 2007. Although she had a three-year diploma and had previously been licensed in Tennessee, she would require additional training to reenter the workforce. Wife's expert testified that, because of the amount of time since Wife's nursing license had lapsed, she would require 600 hours of training to reinstate her license. Further, the trial court found that, in the years since Wife last worked as a nurse, there had "been significant changes" in the nursing field. Wife testified that she was unfamiliar with current medications, technology, and charting, and that she would want to take a remedial course at a local college to modernize her knowledge of the healthcare system. This would further extend the time it would take for Wife to return to work as a nurse, minimizing the time Wife would work before retiring.

Taking all of this into account, we find that the evidence supports the trial court's conclusion that Wife was unable to reenter the workforce and not to reduce her need by her potential income.[6] Therefore, we affirm the trial court.

### B. Wife's other sources of income

Husband next asserts that the trial court erred by failing to adequately consider the income Wife may receive from the investable assets awarded to her in the property division. We agree. From our review of the order, the trial court failed to adequately consider the investment income that both experts testified Wife will have access to as a result of the property division. The trial court found Wife's earning capacity to be

---

[6] Husband directs us to two related cases in support of his assertion that the trial court erred by not reducing Wife's need by her potential income. *See Ellis v. Ellis*, 621 S.W.3d 700 (Tenn. Ct. App. 2019); *Pearson*, 2019 WL 2394247. However, as to Wife's ability to reenter the nursing field, we find both cases inapposite to the present matter because, in both cases, the trial court found the economically dependent spouse had an earning capacity but failed to reduce its alimony award by that amount. *See Ellis*, 621 S.W.3d at 707 ("Moreover, the trial court, in making its alimony award, failed to consider its other findings that Wife could 'reasonably re-enter the employment market' and 'is capable of earning a reasonable income based on her education, training and background' even though Wife stated she had no intention of returning to work."); *Pearson*, 2019 WL 2394247, at *8 ("Here, the trial court determined that Wife has the capacity to earn $ 2,333.33. The error here is the same as that in *Ellis*, i.e., the trial court failed to consider the disadvantaged spouse's earning capacity.").

Here, the trial court found Wife lacked an earning capacity because she could not return to the workforce. This finding differentiates the present case from those cited by Husband. The trial court did not fail to consider income after finding an earning capacity—it found it was not feasible for Wife to reenter the nursing field in the first place. Therefore, these cases do not support Husband's assertions.

"extremely limited" and that she had "no meaningful relative earning capacity" in comparison to Husband because her only source of income was $900 in rental income. While the evidence supports a finding that Wife's earning capacity was significantly less than Husband's substantial earning capacity, the evidence does not support a finding that she had no other sources of income. For the reasons discussed below, the trial court erred in not considering all of Wife's sources of income.

As stated above, Tenn. Code Ann. § 36-5-121(i)(1) required the court to consider "[t]he relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources" in its alimony determination. The trial court was also required to consider "[t]he provisions made with regard to the marital property." Tenn. Code Ann. § 36-5-121(i)(8). In the property division, Wife was awarded $5,496,159 from the marital estate. This included numerous nonliquid assets, including two houses and two vehicles. Wife was also awarded a large amount of financial accounts, including numerous bank accounts; half the value of the Dollar General Account, valued at $1,145,016; all of Husband's Dollar General 401(k) plan, valued at $1,639,934; a brokerage account valued at $424,297; and two IRA accounts valued at $68,300 and $73,069. Therefore, Wife received significant assets that may generate income or serve as a source of income, and the trial court failed to consider the implications of the property division in its alimony determination.

Indeed, there was no dispute among Wife, Mr. Myers, and Mr. Alexander regarding whether Wife could generate income from these assets. A report prepared by Mr. Myers estimated that Wife could earn $162,592 per year from an estimated balance of $3,442,960 in investible assets. Similarly, a report prepared by Mr. Alexander estimated that Wife could have $1,869,715[7] in investible assets, resulting in $111,459 per year in income. For her part, Wife also testified that she expected to receive income from these assets. Unfortunately, these reports were based on numerous assumptions that were not resolved by the trial court in the final order. These include determining the beginning balance of Wife's investible assets and the rate of return to use, as the experts used different rates in their analyses. However, there was no dispute that these assets would serve as a source of income for Wife, and the trial court was required to consider them.[8] The only mention of

---

[7] This balance was based upon an estimated 50/50 division of eight investment accounts. Based upon the court's division, it appears many of these accounts were awarded to Husband in their entirety. However, Wife was still awarded over $1.5 million from accounts listed as investment accounts in Mr. Alexander's report.

[8] The trial court found that Wife "should not be required to utilize her division of the marital estate to provide for her current needs, thereby depleting her share of the marital estate." While Mr. Myers's report supports that, if Wife were to rely solely on the income from her investments and the rental property she was awarded, she would begin to deplete her estate because her monthly expenses would outweigh that income, we are unable to determine that the court adequately considered Wife's income from this finding because the court did not make sufficient findings regarding the amount of Wife's income. If the trial court

this income by the trial court was "other than income derived from funds received in the property division, Wife would have no other financial resources." It was an error not to adequately consider this source of income.

Wife directs us to the recent case of *Chase v. Chase*, 670 S.W.3d 280 (Tenn. Ct. App. 2022), for the proposition that, although trial courts "have considered income derived from assets distributed to the disadvantaged spouse in their determination of alimony," here, "the trial court did not abuse its discretion when it decided not to reduce Wife's need for alimony" by the investment income she would receive. At the outset, it is not apparent from the final order whether the trial court actually chose not to reduce Wife's need by this income or simply failed to consider the source of income in the first place.

In any event, the *Chase* opinion does not support Wife's argument. There, the husband asserted that the assets awarded to the wife would negate her need for any award of spousal support. *Chase*, 670 S.W.3d at 295. In upholding the trial court's decision not to reduce the wife's need by her expected investment income, the *Chase* court first noted that the two experts who testified at that trial came to different conclusions regarding whether the wife could earn any income at all, with the husband's expert projecting significant income and the wife's expert projecting little to no income. *Id*. The trial court credited the wife's expert, which we found was not an abuse of discretion. *Id.* The *Chase* court ultimately concluded that, because of the illiquid nature of the assets awarded to Wife, her lack of employability, and her need to purchase or otherwise establish a new residence (thereby depleting her liquid assets), the trial court did not abuse its discretion. *Id.* at 296.

The *Chase* court also examined two cases that the husband cited in support of his argument, an examination of which is helpful to this Court in the present case. The court first examined the unreported case *Franklin v. DeKlein-Franklin*, No. E2007-00577-COA-R3-CV, 2008 WL 1901113 (Tenn. Ct. App. Apr. 30, 2008). In that case, this Court determined that there was no evidence in the record to support the trial court's award of alimony because the wife had numerous job skills and received a house, a vehicle, and significant liquid assets in the property division. *Franklin*, 2008 WL 1901113, at *14. Ultimately, the wife in *Franklin* received marital assets valued at $2,548,530 and retained separate property of $318,979. *Id.* The *Chase* court found these facts readily distinguishable because there, the wife would have to establish a new residence, lacked marketable job skills, had numerous medical conditions, and did not receive a sizeable award of liquid assets. *Chase*, 670 S.W.3d at 296. The *Chase* court found that these considerations weighed in favor of upholding the trial court's award of alimony. *Id.* at 296-97.

---

desired to craft a spousal support order that prevented Wife from using her portion of the property division, it remained required to consider all sources of income to Wife.

In the present case, we find the facts to be closer to those of *Franklin* than to those of *Chase*. First, we note that both experts who testified at the trial concluded that the assets Wife would receive from the property division could generate income. Next, the property division in the present case more closely resembles that of *Franklin* than that of *Chase* because Wife will receive a significant amount of revenue generating assets and will not have to establish a new residence, as she was awarded the marital home.

The *Chase* court also examined *Stratienko v. Stratienko*, 529 S.W.3d 389 (Tenn. Ct. App. 2017), in which this Court upheld the trial court's decision to award alimony to the wife. *Id.* at 296 (citing *Stratienko*, 529 S.W.3d at 408). In *Stratienko*, the trial court awarded the wife alimony in futuro and in solido after deducting $5,760 per month "to account for the income that Wife would earn from the assets awarded to her through the divorce," a decision this Court left undisturbed. *Stratienko*, 529 S.W.3d at 408. We believe the present case resembles *Stratienko* in that the trial court may award Wife alimony, but it remains obligated to consider the investment income Wife may receive. *See also Barnes v. Barnes*, No. M2022-00328-COA-R3-CV, 2023 WL 6846504, at *17 (Tenn. Ct. App. Oct. 17, 2023) (involving a reduction of the wife's need by her expected investment income when fashioning an alimony award).

Unfortunately, the trial court did not make sufficient findings regarding the appropriate rate of return to use. The experts based their rates on different metrics and came to different conclusions on what rate was appropriate. While both experts testified that they saw no issue with the other's methodology, their reports conclude that Wife will receive substantially different returns on her investments. As explained by this Court:

> [T]he "weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." *Brown* [*v. Crown Equip. Corp.*], 181 S.W.3d [268,] 275 [(Tenn. 2005)]. "Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony." *Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001). "Moreover, it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 676-77 (Tenn. 1983).

*Gergel v. Gergel*, No. E2020-01534-COA-R3-CV, 2022 WL 1222945, at *9 (Tenn. Ct. App. Apr. 26, 2022). Resolving the dispute in the experts' reports is the crux of the issue presented, and resolving this dispute is best left to the trial court. The court also needed to

determine what income Wife would receive based upon the actual property division ordered by the court, as opposed to the estimated divisions used by the experts.[9]

As we have concluded that the trial court failed to make sufficient factual findings regarding the income Wife will earn, we are faced with choosing between two alternatives. One alternative is for this Court to conduct a de novo review of the record to determine where the preponderance of the evidence lies. *Id.* As an example, this option is appropriate "when the trial court's decision is 'readily ascertainable' or 'involves only a clear legal issue.'" *Bailey v. Bailey*, No. M2022-01467-COA-R3-CV, 2025 WL 1517411, at \*12 (Tenn. Ct. App. May 28, 2025) (collecting cases).

However, when "complications . . . obscure the path ahead," vacatur and remand may be the more appropriate remedy. *Id.* "Vacatur is often the preferred option when the issues presented on appeal are fact-intensive and turn on disputed factual predicates." *Id.* Similarly, vacatur "has been employed where the outcome may hinge on the credibility of witnesses," but the trial court failed to make sufficient credibility determinations. *Id.* The remaining issues in the present case are fact-intensive and include the actual amount of investible assets, the rate of return, and, ultimately, the value of this source of income. These are all fact-intensive questions that would not be appropriate for this Court to resolve in the first instance. The issue of what rate of return to use also requires a determination of which expert the trial court credits, and the trial court should be afforded the opportunity to make this determination. Therefore, the portion of the order awarding spousal support is vacated, and the matter is remanded for further proceedings consistent with this opinion.[10] The order is affirmed in all other respects. Because of our decision to vacate the court's award of spousal support, we find Husband's second issue—whether it was an error to award Wife support in excess of her stated need—to be pretermitted.

---

[9] We note that the trial court awarded Wife the full value of the Dollar General Account, even though Husband cannot access the full value of this account due to various vesting requirements. In the amended order, the trial court reiterated that it awarded Wife 50% of the available stocks and options but did not place a value on this amount. An exhibit in the record detailing this account states that $1.62 million was available, while $664,420 was unavailable but the court did not make a finding on this exhibit. The amended order directed Husband to transfer to Wife half the value of the unavailable PSUs, RSUs, and options, less taxes and fees, once they became available. This further complicates the calculation of the income available to Wife and supports our determination that the trial court must make findings on the income available to Wife. If needed, the trial court may take additional evidence to assist in determining what Husband is to transfer to Wife.

[10] In her expense statement, Wife listed the $272 per month payment due on the parties' HELOC. Husband was ordered to pay off the HELOC, thus negating this expense. The trial court failed to deduct this expense from Wife's need. The trial court should also use remand to correct its error regarding the HELOC on the marital home. The remaining expenses challenged by Husband are supported by the evidence.

## II. Attorney's fees

We lastly address Wife's request for her appellate attorney's fees. This Court is empowered under Tenn. Code Ann. § 36-5-103(c) to award the prevailing party the reasonable attorney fees incurred "in any . . . proceeding to enforce, alter, change, or modify any decree of alimony[.]" Whether to award fees under this statute is within the discretion of this Court. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Dec. 17, 2007). When deciding whether to award fees under this statute, we consider "the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Wife was awarded sufficient assets to pay her appellate attorney's fees and was only partially successful on appeal. Therefore, we decline to award Wife her appellate attorney's fees.

### CONCLUSION

The judgment of the trial court is affirmed in part, vacated in part, and remanded. Costs of this appeal are assessed equally against the appellant, Roderick Jay West, and the appellee, Cynthia Allen West, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 13 -